UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EDGAR ANDRES SOTO PENA, | § § § | |
| Petitioner, | § § | |
| v. | § § | 1:17-CV-903-RP |
| ALEJANDRA EGGLETON SERRANO, | § § § | |
| Respondent. | § § | |

## ORDER

Edgar Andres Soto Pena filed a petition under The Hague Convention on Civil Aspects of International Child Abduction (the "Convention"), T.I.A.S. No. 11670, 19 I.L.M. 1501, codified by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601, et seq., seeking the return of his children to Mexico. This Court commenced a full evidentiary hearing, during which the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, and oral arguments presented during trial, along with the applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that should be construed as a conclusion of law is adopted as such. Any conclusion of law that should be construed as a finding of fact is adopted as such.

## I. BACKGROUND

Petitioner Edgar Andres Soto Pena ("Petitioner") alleges Respondent Alejandra Eggleton Serrano ("Respondent") wrongfully removed their three children A.S.E., D.S.E., and S.S.E. (the "children") from Mexico to the United States in June 2017. (Am. Compl., Dkt. 3, at 4). Petitioner filed this suit on September 16, 2017, asking the Court to order the return of the children to their habitual residence in Mexico. (Compl., Dkt. 1). Petitioner filed a motion for temporary restraining order on September 20, 2017. (Pet'r's Mot. TRO, Dkt. 5). On that same day, this Court granted that

1

motion, in part, ordering that (1) Respondent was prohibited from removing the children from this Court's jurisdiction pending further order from the Court; (2) a hearing on the matter was set for September 29, 2017, at which Respondent was ordered to appear and show cause why the temporary restraining order should not be extended; (3) Respondent was required to surrender the childrens' passports; and (4) Petitioner was ordered to serve Respondent with the Amended Verified Petition and other documents by September 22, 2017. (Dkt. 7). By an order the next day, this Court granted Petitioner's motion for issuance of service of citation by U.S. Marshals. (Dkt. 8).

At the hearing on September 29, 2017, the Court extended the temporary restraining order until the next hearing and set a briefing schedule. (*See* Dkt. 12). The Court also ordered weekend visitation for Petitioner. (*Id.*). Also on September 29, Respondent surrendered the children's passports per the temporary restraining order. (Dkt. 13). After briefing was submitted by both parties, (Dkts. 18, 19), the Court held a full hearing on the merits on November 3, 2017, during which the Court received evidence and heard sworn testimony.

During the hearing, two witnesses testified: Petitioner Edgar Andres Soto Pena and Felix Roberto Saenz Gonzalez. (Witness List, Dkt. 21). Mr. Saenz Gonzalez, who testified on behalf of Respondent, was held out as an expert on Mexican family law. Petitioner objected to the testimony, contending that Mr. Saenz Gonzalez was not qualified to testify as an expert. The Court took the objection under advisement and addresses the objection in this order. *See infra* Part III.A.

## II. FINDINGS OF FACT

The following facts have been established by a preponderance of the evidence.[1] Petitioner and Respondent are Mexican nationals who married in 2005 in Mexico. (Pet'r's Mot. TRO, Dkt. 5, at 2). Petitioner and Respondent are the parents of A.S.E., D.S.E., and S.S.E. (*Id.*). The family resided

---

[1] The findings of fact are based on the testimony and other evidence presented at the November 3, 2017, evidentiary hearing and the parties' filings prior to the trial, including the Amended Verified Petition, Motion for Ex Parte Temporary Restraining Order, and the parties' pre-trial briefs.

2

in Mexico until August 2009, when they moved to Austin, Texas, while Petitioner completed a one-year Master of Business Administration program. (Trial Exhibits, Dkt. 22-2, at 64). From May 2010 until October 2012, the family resided in Texas while Petitioner worked in Texas. (*Id.*). In October 2012, the family moved to Monterrey, Mexico. (*Id.*). A few years later in August 2014, the family returned to Texas. (*Id.* at 65). Petitioner returned to Mexico in March 2015. (*Id.*). Respondent and the children remained in Texas until July 2015. (*Id.*). Upon their return to Mexico, Respondent initiated divorce proceedings. (*Id.*).

Petitioner and Respondent obtained a divorce in December 2015. (Dkt. 5, at 2). The divorce was a voluntary divorce, and the parties agreed to its terms. (Dkt. 22-1, at 55). Per the divorce decree, Petitioner and Respondent agreed that "the care and custody of the under-age children was to be executed by [Respondent], and the legal custody by both parents, during this proceeding and once the sentence has been executed." (*Id.* at 60). They further agreed that their children "shall be under the custody of the female spouse," and that Petitioner would have coexistence rights, including the ability to visit with his children on Wednesdays after school and every other weekend. (*Id.* at 61–62).

The decree also addressed changes in residence. Petitioner and Respondent agreed to notify each other and the court of any change in domicile. (*Id.*). Specifically, they agreed that "[i]n the event [Respondent] changes her domicile to a city other than Monterrey, Nuevo Leon, [Respondent] shall still hold custody of her under-age children, and [Petitioner] shall continue to be entitled to the coexistence rights with his under-age children under the same provisions hereof." (*Id.* at 62).

On March 14, 2017, Petitioner and Respondent modified the divorce decree by agreement. (Dkt. 22-2, at 30). That modification addressed Petitioner's right of access on Wednesdays after school and every other weekend, changing the terms and conditions of those visits. (*Id.* at 30–32).

3

The modification expressly stated that the December 2015 decree, with the exception of the modifications regarding Petitioner's visitation, otherwise remained unaltered. (*Id.* at 32).

In June 2017, Respondent advised Petitioner that she and the children had moved to the Austin, Texas metro. (*Id.* at 68). The Mexican court that handled Petitioner and Respondent's divorce and subsequent modification addressed Respondent's move to Austin with the children in a document dated October 24, 2017. The Mexican court stated:

> [N]o change in residence could be carried out unilaterally by the person holding care and custody of the minors, because the ownership of said right does not grant an all-encompassing and exclusive power to determine the place the minors should reside in, this derives from the fact such an important decision should consider the other parent as well, because having full exercise of parental rights, grants the other parent the right to coexist with his children, and even to secure their physical, spiritual and moral upbringing, as well as to prepare them for having a profession or specific activity that may be useful for them, and which may not be accomplished if the minors are moved to a distant place without his consent, therefore it is undeniable both parents must agree to this change by mutual consent.

(*Id.* at 91–92).

On October 27, 2017, the Secretary of Foreign Relations for the Mexican Central Authority certified that the children's "removal from their habitual residence in Mexico was wrongful given the fact that there is a valid access rights agreement signed by the parents on December 16th, 2015, before the Fifth Family Court of the First District in Monterrey, Nuevo Leon." (*Id.* at 101). The Secretary also stated that Petitioner and Respondent hold *patria potestad* rights over the children and that, because they "share parental rights over the children, and those rights include making a decision about the children's place of residence . . . . Thus, any unilateral decision made by the mother in contravention thereof is a breach of the rights attributed to the other parent and falls within the definition of illicit retention contained in Article 3 of the Convention." (*Id.*).

## III. CONCLUSIONS OF LAW

*A. Expert Testimony*

During the evidentiary hearing on November 3, 2017, Mr. Saenz Gonzalez testified as an expert witness on issues of family law in Mexico. He testified that he is a litigating attorney in Mexico, who has practiced for seventeen years in the areas of family law and civil law. He also represents Respondent in the family law proceedings ongoing in Mexico. Petitioner objected to his testimony on two bases: (1) he was not eligible to testify as an expert since he represents Respondent, and (2) he was not qualified to testify as an expert on family law. Upon inquiry from the Court, Petitioner abandoned the first argument—that Mr. Saenz Gonzalez's representation of Respondent in Mexico disqualified him from testifying as an expert in this instant case. Petitioner maintained his other objection regarding Mr. Saenz Gonzalez's qualifications and, during cross examination, Petitioner's counsel asked him whether he had written an article published in a legal journal. He responded that he had not.

Applying Mexican law may pose some challenges for American courts that "lack[] adequate familiarity with such law. Recognizing the peculiar nature of the issue of foreign law, Federal Rule of Civil Procedure 44.1 liberalizes the evidentiary rules for determining such law." *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 621 (W.D. Tex. 2012). Rule 44.1 provides, in part: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Pursuant to Rule 44.1, this Court accepts Mr. Saenz Gonzalez's testimony as testimony of an expert witness. *See also Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 918 (W.D. Tex. 2012) (accepting an affidavit of a Mexican attorney regarding Mexican law). Moreover, while Mr. Saenz Gonzalez's testimony generally informed the Court on issues of Mexican law, his testimony did not control the outcome.

*B. The Hague Convention and ICARA*

The Convention on the Civil Aspects of International Child Abduction governs civil proceedings filed in signatory countries for the recovery of abducted children. The United States and Mexico are signatories to the Convention. ICARA, 22 U.S.C. § 9003 et seq., establishes the procedures for the implementation of the Convention. The Convention and ICARA empower courts to order the return of children removed from their country of habitual residence, not to determine the merits of an underlying custody dispute. 22 U.S.C. § 9001(b)(4); *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

Courts do not assess the merits of the underlying custody dispute. Rather, a court's inquiry is limited to determining whether or not the child has been wrongfully removed from their country of "habitual residence." *Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014) (citing *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (citing 42 U.S.C. § 11601(b)(4))). If the removal was wrongful, the Convention requires that a court order the return of the removed or retained child.

The removal or retention of a child is wrongful if the petitioner proves by a preponderance of the evidence that: (1) the child was removed from the child's country of habitual residence; (2) the removal was in breach of petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of removal. Hague Convention, arts. 3, 12.

*C. Habitual Residence*

In this case, Petitioner contends Respondent wrongfully removed the children from their habitual residence in Mexico. To meet the first element of wrongful removal, Petitioner must show by a preponderance of the evidence that Mexico was the country of the children's habitual residence at the time of their removal. Habitual residence is a mixed question of law and fact. *Berezowsky*, 765 F.3d at 465–66. "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-

intensive determination that necessarily varies with the circumstances of each case." *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012) (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). "At core, however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of [the child's] parents, who usually effect the removal or retention giving rise to a Convention petition." *Id.*

"Courts use varying approaches to determine a child's habitual residence, each placing different emphasis on the weight given to the parents' intentions." *Id.* The Fifth Circuit has "adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Id.* That approach gives greater weight to the parents' intentions relative to the child's age. *Id.* In cases involving young children, like this one, the threshold question is "whether both parents intended for the child to abandon the [habitual residence] left behind." *Id.* at 310–11.

Here, the children's habitual residence in June 2017—the time of removal—was Monterrey, Nuevo Leon, Mexico. The parties do not dispute that Monterrey was the children's habitual residence and, in fact, focus largely on aspects of the required analysis other than habitual residence. While the family lived in United States for periods of time and two of the three children were born in the United States, the family had returned to Monterrey a few years before the removal. During that time, there is no evidence or argument that Petitioner and Respondent shared an intention for the children to move back to Austin, and that is the focus of a court's inquiry under the Fifth Circuit's "threshold test" of "whether both parents intended for the [young] child" to leave the prior habitual residence. *Id.* During the hearing, Petitioner also testified that he and Respondent "never talked about [Respondent] leaving Monterrey." Therefore, despite the children's ties to Austin and the United States, their habitual residence at the time of removal was Monterrey. *Id.* at 311 ("Regardless of the ties that [the child] unavoidably developed in the U.K., . . . his young age

7

requires [petitioner's and respondent's] shared intentions be the primary focus in the habitual residence inquiry here.").

*D. Breach of Rights of Custody*

Petitioner must also prove that the removal was in breach of Petitioner's rights of custody under Mexican law. "'Rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5. The rights of custody may be held either jointly or alone under the law of the country in which the child was habitually residing immediately before the removal or retention. Hague Convention, art. 3. The Convention does not require a formal custody decree; rights of custody exist by mere operation of law. Hague Convention, art. 3. The term "rights of custody" is to be broadly interpreted so as to bring as many cases as possible under the purview of the Convention. *Abbott v. Abbott*, 560 U.S. 1, 19 (2010).

Because the Court has found that the children were habitually residing in Monterrey, Nuevo Leon, Mexico immediately before their removal, the rights of custody will be determined by the application of the laws of the Republic of Mexico. *See Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 918 (W.D. Tex. 2012) (Counts, Mag.). Petitioner provided the Court with a translation of an excerpt of the Civil Code for the State of Nuevo Leon ("Civil Code"). (Excerpt of Civil Code of Nuevo Leon, Dkt. 22-2, at 81–84). Under Article 413 of the Civil Code, "[p]arental authority / responsibility (*patria potestas*) is to be exerted over the children themselves as well as over their assets." (*Id.* at 81). Additionally, Article 414 of the Civil Code states that "[p]arental authority/responsibility is exerted jointly by both parents." (*Id.*).

Thus, the State of Nuevo Leon, Mexico, in accordance with the Civil Code, adheres to the legal doctrine of *patria potestad* (meaning "parental rights"), under which "both parents have joint custody rights." *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 623–24 (W.D. Tex. 2012) (providing a

8

comprehensive discussion of *patria potestad* and the rights attributable to parents under the doctrine). Originating in Roman law, the modern doctrine of *patria potestad* "'regulates relations between parents and children until the latter reach the age at which they must fend for themselves' [and it] constitutes the most comprehensive right that a parent can exercise over the person and property of his or her minor children." *Id.* at 624 (quoting *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527, 527, 529 (2005) (quotation marks omitted).

In this case, the parties agree that the Civil Code expressly adopts the doctrine of *patria potestad*, and the parties do not contest that the divorce decree recognizes and incorporates the doctrine. (Resp't's Pre-Trial Br., Dkt. 18, at 2 ("Admittedly, the order does state that the parents possess *patria potestad por ambos*, which the English version of the divorce translates to 'the legal custody by both parents.'")). As to each parent individually, the decree establishes other, different rights and responsibilities. Petitioner is granted "coexistence rights," which are similar to visitation rights in the United States,[2] Divorce Decree, Dkt. 22-1, at 62, and provides that Respondent possesses "the care and custody of the under-age children," *id.* at 60. While both Petitioner and Respondent must notify the court and each other of any change in domicile, the parties agreed to the following: "In the event [Respondent] changed her domicile to a city other than Monterrey, Nuevo Leon, the mother shall still hold custody of her under-age children, and the father shall continue to be entitled to the coexistence rights with his under-age children." (*Id.* at 62).

The principal issue presented by the parties therefore is whether this specific language of the decree trumped the doctrine of *patria potestad* and allowed Respondent to move the children to Austin without violating the Convention. Respondent argues that the only potential wrongdoing was that Respondent's move to Austin breached Petitioner's coexistence rights under the decree but

---

[2] There was a 2017 modification to the decree that changed the terms and conditions of Petitioner's visits. (Resp't's Pre-Trial Br., Dkt. 18, at 2 (describing the modification's changes); Modification to the Decree, Dkt. 22-2, at 30–32). Because those changes do not control the Court's determination and the parties do not dispute what changes were made, the Court relies on the original 2015 decree, unless otherwise noted.

does not create a return remedy under the Convention. (Dkt. 18, at 3). A handful of courts have grappled with the question of whether the language of a divorce decree can supersede the Nuevo Leon Civil Code—and its incorporation of *patria potestad*—to abolish one parent's *patria potestad* rights.

Within the Fifth Circuit, at least one court has considered the issue: *Ibarra v. Quintanilla Garcia*, 476 F. Supp. 2d 630 (S.D. Tex. 2007). In *Ibarra*, the petitioner and respondent were Mexican citizens who married, had a child, and then divorced. *Id.* at 632. The parties resided in Monterrey. *Id.* Several months after the divorce, the respondent mother took the child to Houston to live with her and her new husband. *Id.* The divorce decree recognized the parties' rights of *patria potestad*, awarded respondent custody of the child, and awarded the petitioner father visitations rights. *Id.* at 635.

In evaluating whether the petitioner had the right of custody over the child, the court in *Ibarra* concluded that "[t]o the extent that Mexican law of *patria potestad* afforded [petitioner] any rights of custody of the child, [petitioner] relinquished such rights in the agreed divorce decree." *Id.* Acknowledging that petitioner had visitation rights, the court stated that he could exercise his "remaining rights of *patria potestad* over the child" when he had possession of the child for visits. *Id.* The court thus held that "[b]ecause [respondent's] removal of the child did not breach the [petitioner's] 'rights of custody,' the [petitioner] is not entitled to the return of the child." *Id.*

Looking outside the Fifth Circuit, several courts have addressed the interplay of a divorce decree and the Nuevo Leon Civil Code for purposes of determining the effect of *patria potestad* on a Hague Convention petition. In *Garcia v. Pinelo*, the Northern District of Illinois decided that "*patria potestas* is a default doctrine and hence does not override rights conferred by a valid custody agreement between the parents." 125 F. Supp. 3d 794, 805 (N.D. Ill. 2015) (citing *Altamiranda Vale v. Avila*, 538 F.3d 581, 586–87 (7th Cir. 2008) (citing *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002), *abrogated on other grounds by Abbott*, 560 U.S. at 22)). Although the divorce decree in *Garcia* did not

mention *patria potestad*, the court concluded that petitioner retained his rights of custody under the doctrine and that his "specific visitation rights . . . provide[d] *context* for interpreting the order and its effect on [petitioner's] rights." *Id.* at 806–07. Finally, the court rejected the reasoning in *Ibarra* since the divorce decree in that case expressly incorporated *patria potestad*, putting *Ibarra* at odds with Seventh Circuit authority holding that such decrees "afford[] parents the relevant rights of custody under the Convention." *Id.* at 808 (citing *Altamiranda*, 538 F.3d at 587). On appeal, the Seventh Circuit agreed with the district court that petitioner held rights of custody and questioned whether *patria potestad* could be extinguished by a divorce decree. *Garcia v. Pinelo*, 808 F.3d 1158, 1166 (7th Cir. 2015). Looking to other articles of the Civil Code that spell out when *patria potestad* may be suspended or terminated, the court stated that: "[n]either a custody agreement nor anything akin to one is listed as a condition that may terminate, suspend, or even limit *patria potestas*. Nor is there a general provision for the judicial surrender of parental authority and responsibility."[3] *Id.* at 1167. Since the decree was silent on *patria potestad*, the Seventh Circuit held that it did not extinguish petitioner's *patria potestad* right over the child. *Id.*

In *Gatica v. Martinez*, the Southern District of Florida adopted a magistrate judge's report and recommendation granting a petition brought pursuant to the Hague Convention. 2011 WL 2110291 (S.D. Fla. May 25, 2011) (adopting 2010 WL 6744790 (S.D. Fla. Oct. 13, 2010)). In the report and recommendation, the magistrate judge considered whether petitioner's right to custody was established by *patria potestad* in light of the divorce decree awarding petitioner visitation rights, not physical custody. 2010 WL 6744790, at *4–6. In that case, the divorce decree "expressly mentioned" the doctrine. *Id.* at *4. After acknowledging that most courts have concluded that *patria potestad* constitutes a right of custody, the court turned to *Ibarra* and rejected its reasoning. *Id.* *5–6. In its order adopting, the district court also rejected respondent's argument that petitioner's visitation

---

[3] "Patria potestas" is the original Latin whereas "patria potestad" is the Spanish term for the doctrine. In this order, which relies on Mexican law, the Court uses the Spanish term.

11

rights did not amount to rights of custody on the grounds that the divorce decree "clearly bestowed to both parents *patria potestad* rights, which constitute rights of custody enforceable under the Convention." 2011 WL 2110291, at *2. The district court also explained that respondent conflated the rights of custody under the Convention with physical custody under the divorce decree. *Id.*

After surveying these decisions, this Court declines to conclude that Petitioner's *patria potestad* rights—which were expressly bestowed in the divorce decree and given by statutory law—were also simultaneously relinquished by other provisions of the decree. As the Seventh Circuit explained, "*[p]atria potestas* is central to Mexican family law," *Garcia*, 808 F.3d at 1165, and the grant of those rights would not be easily revoked. Whether *patria potestad* may be extinguished by an agreement or court order may be up for debate, but, in this case, those parental rights were not expressly terminated or abandoned. *See id.* at 1167 (noting that, under the Civil Code, *patria potestad* rights are not waivable and only may be terminated "expressly" or in certain situations of wrongdoing).

The grounds for finding that Petitioner held rights of custody pursuant to *patria potestad* are even stronger in this case which is akin to *Gatica*, where, in addition to the Civil Code's general grant of *patria potestad*, the divorce decree also awarded the respondent physical custody of the children but provided both parents with *patria potestad* rights. *Patria potestad* rights, "specifically incorporated into a custody agreement, amount to 'rights of custody' under the Convention." *Gatica*, 2010 WL 6744790, at *6 (R. & R.). The divorce decree at issue here confirms the rights of both Petitioner and Respondent under the doctrine of *patria potestad*, and those rights amount to right of custody under the Convention. *Gatica*, 2011 WL 2110291, at *2 (order adopting R. & R.). This Court's conclusion also aligns with the host of cases in the Fifth Circuit finding that a petitioner has rights of custody conveyed by *patria potestad* generally and under other state civil codes in Mexico. *See, e.g.*, *Sierra v. Tapasco*, No. 4:15-CV-00640, 2016 WL 5402933, at *7 (S.D. Tex. Sept. 28, 2016), *aff'd*, 694 F. App'x

12

957 (5th Cir. 2017) ("*Patria potestas* rights under Mexican law are rights of custody under the Hague Convention. . . . Consequently, absent a court order abolishing one parent's *patria potestas* rights, both parents have joint custody rights over their minor children.") (quotation marks and citations omitted); *Castro v. Martinez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012) (finding that *patria potestad* satisfied rights of custody in a case arising from Coahuila, Mexico); *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 572–74 (W.D. Tex. 2013) (finding that *patria potestad* satisfied rights of custody in a case arising from Sonora, Mexico) (Counts, Mag.).

Respondent's fallback position is that, even if *patria potestad* is applicable, the doctrine does not establish Petitioner's *ne exeat* right. (Dkt. 18, at 4). A *ne exeat* right is the right of a parent to decide whether a child can leave the country. *Abbott*, 560 U.S. at 9–13. Under this right, one parent cannot remove a child from the country without the permission of the other parent or a court order. *Id.* A *ne exeat* right constitutes a right of custody within the meaning of the Convention. *Id.* at 10. The crux of Respondent's contention is that the divorce decree allows Respondent to move the children to a different city without Petitioner's consent. The decree states: "In the event [Respondent] changed her domicile to a city other than Monterrey, Nuevo Leon, the mother shall still hold custody of her underage children, and the father shall continue to be entitled to the coexistence rights with his underage children." (Dkt. 22-1, at 62). While the decree does not contain an express *ne exeat* clause,[4] *cf. Edoho v. Edoho*, No. CIV.A. H-10-1881, 2010 WL 3257480, at *5 (S.D. Tex. Aug. 17, 2010) ("The custody and maintenance order of April 8, 2008 contained a *ne exeat* clause."), Petitioner argues instead that the decree impliedly grants him a *ne exeat* right by (1) explicitly granting him *patria potestad* rights and/or (2) restricting Respondent's geographical location. (Dkt. 19, at 5, 8). Unfortunately, neither Petitioner nor Respondent presents much specific legal

---

[4] The 2017 modification order addresses the children's location of residence only as follows: "[Petitioner and Respondent] are advised to notify each other personally or through this Court, of any change on the regular address of their underage children, as well as of the domicile they reside in." (Dkt. 22-2, at 32).

13

support for their respective arguments,[5] and the Court did not uncover a *ne exeat* provision within the excerpts of the Civil Code that were provided. In contrast, in *Abbott*, the law of Chile granted the petitioner a *ne exeat* right or "a joint right to decide his child's country of residence." 560 U.S. at 10.

That said, whether the Civil Code addresses a parent's *ne exeat* right is not a necessary piece of information for this Court to reach its conclusion because Petitioner's *patria potestad* rights are sufficient to prove a prima facie case of wrongful removal under the Convention. *See Saldivar*, 879 F. Supp. 2d at 624–25 ("Chihuahua's institution of *patria potestad* gives [petitioner] both the right relating to the care of the person of the child and the right to determine the child's place of residence as contemplated under . . . the Convention.") (quotation marks omitted). *Patria potestad* offers parents strong rights over their children. "Designed to protect the interest of children, *patria potestad* constitutes the 'most comprehensive' right that a parent can exercise over the person and property of his or her minor children." *Id.* at 624 (quoting Stephen Zamora et al., Mexican Law 482 (2004) and citing Patricia Begne, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527, 527, 531 (2005)). If the Court were to find that Petitioner had rights under *patria potestad* but not under *ne exeat* and therefore his children could be removed without his consent to another country, that conclusion could weaken Mexico's "most comprehensive" parental rights or even render that bundle of rights, or some portion of it, superfluous.

In sum, Petitioner has rights of custody under Mexican law and a preponderance of the evidence establishes Respondent breached Petitioner's rights of custody to the children when Respondent removed them from Mexico to the United States. This Court's finding is further supported by two official Mexican documents. The first is a document issued on October 24, 2017, by the Mexican court that has presided over the family law matters between Petitioner and

---

[5] Petitioner presents a "thesis" from the "Mexican Supreme Court," or The Supreme Court of Justice of the Nation, to support his argument. The one paragraph, without more context, appears to state that even when a custodial parent is allowed to move, that parent cannot move too far away because a great distance would make the child's right to visitation with the other parent nugatory or excessively difficult. (Dkt. 22-2, at 89).

Respondent. (Dkt. 22-2, at 91–95 ). The parties disagree about the characterization of it as an order, a decree, or a writ. In it, the court states that it was necessary for Respondent to obtain consent from Petitioner or the court before unilaterally relocating with the children to a distant place, at least partly because of its impact on Petitioner's coexistence rights. (*Id.* at 93). Respondent has since submitted an opposition to the court's document. The second official Mexican document is a letter from the Mexican Central Authority dated October 27, 2017, and sent to the United States Department of State in accordance with Article 15 of the Convention. (*Id.* at 101). The letter states that "both parents share parental rights over the children, and those rights include making a decision about the children's place of residence . . . . Thus, any unilateral decision made by the mother in contravention thereof is a breach of the rights attributed to the other parent and falls within the definition of illicit retention" under the Convention. (*Id.*).

  *E. Exercise of Rights of Custody*

  Finally, for the removal to have been wrongful, Petitioner must show that Petitioner was, or otherwise would have been, exercising rights of custody to the children under Mexican law at the time of removal. "American courts have interpreted 'exercise' broadly." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004). It is undisputed that at the time Respondent removed the children to the United States, Petitioner was exercising his rights of custody. The evidence presented to the Court—including photographs—shows that Petitioner was spending time with the children. (Dkt. 22-1, at 18–42). In fact, the modification of the divorce decree in 2017, just a few months before the removal, largely addressed Petitioner's visits with the children during the week and on weekends. (Dkt. 22-2, at 30–32). Therefore, a preponderance of the evidence establishes Petitioner was exercising his rights of custody at the time of the children's removal.

Accordingly, the Court concludes that Petitioner has met his prima facie burden under Article 3 of the Hague Convention and under the ICARA for a claim of wrongful removal and retention.

*F. Defenses to Wrongful Removal*

When a child has been wrongfully removed, the child must be returned, "unless certain exceptions apply." *Abbott*, 560 U.S. at 9. "The Convention sets forth five narrow affirmative defenses to return of a child wrongfully removed or retained from the country of habitual residence." *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 575 (W.D. Tex. 2013). The five defenses are: (1) grave risk of physical or psychological harm, (2) when return would violate the fundamental principles relating to the protection of human rights and fundamental freedoms of the returning country, (3) when judicial proceedings were commenced one year after the date of retention and the respondent proves that the child is now settled into the new environment, (4) when the child objects to return and the court finds that the child has reached an age and level of maturity appropriate for the court to take into account the child's view, and (5) when the petitioner seeking return of the child had consented to or subsequently acquiesced to the removal or retention. *Id.* (quotation marks omitted). Here, Respondent does not raise any of these defenses, and the Court's determination of wrongful removal thus stands.

*G. Attorney's Fees*

Any court ordering the return of a child shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, and transportation costs related to the return of the child, unless respondent establishes that such order would be clearly inappropriate. 22 U.S.C. § 9007(b)(3). Petitioner shall submit to this Court his motion for fees, with Respondent having the burden, in response, to show that an award of attorney fees, expenses, and costs would be "clearly inappropriate." *Saldivar*, 879 F. Supp. 2d at 632.

16

## IV. CONCLUSION

For these reasons, this Court holds that the children's habitual residence is the Republic of Mexico and that the children were wrongfully removed or retained in the United States in violation of the Convention. Petitioner's Verified Petition for Return of Minor Children to Their Habitual Residence (Mexico) is **GRANTED**.

**IT IS ORDERED** that the children (A.S.E., D.S.E., and S.S.E.) shall be promptly returned to Mexico, their country of habitual residence. The passports for the children, held by the Court, are released to the Petitioner or his designated representative to effectuate the children's return to Mexico.

Until the date of return:

(1) the children shall remain in the custody of Respondent;

(2) Petitioner maintains his existing rights to visit the children on any weekends and holidays between the date of this order and their prompt return;

(3) if Petitioner visits the children, he shall take the children to their scheduled sports activities, including soccer practices, games, and tournaments; and

(4) Respondent and any person acting in concert or participating with her are prohibited from taking any action to remove the children outside of the Austin Division of the Western District of Texas.

On the date of return, the children shall be delivered to Petitioner for travel to Mexico.

**IT IS FURTHER ORDERED** that Respondent pay all necessary expenses and attorney fees pursuant to 42 U.S.C. § 11607(b)(3). The award of attorney fees and costs under 42 U.S.C § 11607(b)(3) is contingent upon Petitioner filing, within twenty-one (21) days of this order, an itemization of all costs requested and a brief detailing the services rendered. Fed. R. Civ. P. 54(d)(2)(B)(i). Respondent shall have seven (7) days from date of service of Petitioner's itemization

and brief to file a brief in response, asserting why the requested award is "clearly inappropriate." *See* 42 U.S.C. § 11607(b)(3). This Court will then determine the appropriate monetary award of attorney fees and costs.

**SIGNED** on December 21, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE